T.C. Memo. 1998-273


UNITED STATES TAX COURT


ANCLOTE PSYCHIATRIC CENTER, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4810-92.                    Filed July 27, 1998.


<u>Robert Williams</u> and <u>V. Jean Owens</u>, for petitioner.

<u>Julie M. T. Foster</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, <u>Judge</u>:  Respondent revoked recognition of petitioner's status as an organization exempt from income tax under section 501(a) effective October 1, 1982, and determined the following deficiencies in Federal income tax:

| Taxable Year Ended[1] | Deficiency |
|---|---|
| Sept. 30, 1984 | $159,008 |
| Sept. 30, 1985 | 110,623 |
| Sept. 30, 1986 | 75,490 |
| Sept. 30, 1987 | 45,444 |
| Sept. 30, 1988 | 62,041 |

Unless otherwise stated, all section references are to the Internal Revenue Code, as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The primary issue for decision is whether petitioner's tax-exempt status should be revoked. This issue turns on the question whether petitioner's sale of its hospital in May 1983 was for less than fair market value, resulting in prohibited inurement within the meaning of section 501(c)(3). If we decide that there was no such inurement, we must decide whether petitioner's tax-exempt status should be revoked for failure to conduct exempt activities for its fiscal years ended September 30, 1985, and 1986.

If we decide petitioner's tax-exempt status was properly revoked, then we must decide whether petitioner is entitled to deduct certain amounts as ordinary and necessary business expenses during the years for which its income is no longer tax-exempt.

---

[1] The issuance of a notice of deficiency for the taxable year ended Sept. 30, 1983, is barred by the period of limitations.

- 3 -

If petitioner's tax-exempt status is revoked effective October 1, 1982, we must decide whether petitioner is entitled to a net operating loss carryover from its fiscal year ended September 30, 1983.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioner had its principal place of business in Tarpon Springs, Florida, at the time it filed its petition. Petitioner filed its Federal Returns of Organization Exempt From Income Tax Under section 501(c) of the Internal Revenue Code (Forms 990) for the years in issue with the Atlanta Service Center, Atlanta, Georgia. For all relevant periods, petitioner used a fiscal year ending September 30. Its reports on Form 990 reflected that petitioner utilized the accrual method of accounting.

Petitioner is a Florida corporation, organized under chapter 617 of Florida Statutes as a corporation not-for-profit. Petitioner was originally incorporated in 1951, as a for-profit corporation and, in December 1953, began operation of Anclote Manor Hospital (the hospital). In 1958, petitioner became a nonprofit corporation and received a determination letter that it qualified as a Federal tax-exempt corporation under section 501(c)(3).

When the hospital opened, it provided every type of psychiatric treatment. Although the hospital began as a short-term treatment facility with an average length of stay of 1 to 2 weeks, by 1968, it had become a long-term treatment facility with an average length of stay of 430 days. The hospital operated as a "closed" medical hospital in that its medical staff did not have independent outside medical practices.

By 1980, petitioner operated a 99-bed facility with a high occupancy rate. The hospital was one of only five to seven long-term facilities at that time. Referrals came from short-term psychiatric hospitals nationwide. By 1981, its beds were full and it was turning down patients for admission. On November 19, 1982, petitioner obtained a certificate of need from the State of Florida Department of Health and Rehabilitative Services allowing it to increase its number of beds by 31.

Dr. Walter H. Wellborn, Jr. (Dr. Wellborn), became petitioner's president and chief executive officer in 1980. He began working for petitioner in 1953, prior to the hospital's opening. Petitioner was governed by a board of 12 directors (the board) consisting of medical doctors and business persons from the local community and southeastern United States.

During the 1950's and 1960's, petitioner's patients generally paid for their own treatment. During the 1970's and 1980's, petitioner had patients whose private health insurance

paid for their treatment and those who paid themselves. However, petitioner never admitted Medicare or Medicaid patients.

The hospital is situated on about 20 acres. In addition, petitioner owned two nonadjacent unimproved parcels known as the Belcher Road property (approximately 4.2 acres) and the County Road #77 property (approximately 76 acres) and two waterfront lots across the street from the hospital. Blanton Realty appraised the Belcher Road property for $210,000 as of March 5, 1981. As of July 8, 1982, Blanton Realty appraised the County Road #77 property at $836,000 and the two lots at $60,000.

The Sale of the Hospital

In or about 1980, Dr. Wellborn and a few board members attended several meetings of the National Association of Private Psychiatric Hospitals where information was given about restructuring psychiatric hospitals; hospitals were changing from not-for-profit to for-profit organizations. Dr. Wellborn and the other board members were looking for ways to generate funds to expand the hospital and, at the same time, support petitioner's research and educational goals. Dr. Wellborn wished to continue running the hospital, and the board supported that relationship.

Sometime in the first half of 1981, the board engaged James O'Donnell (Mr. O'Donnell), a Jacksonville, Florida, tax attorney, to advise them regarding converting to a for-profit entity, with the possible sale of the hospital to an entity to be formed by

some or all of the board members, and the tax effects of such a transaction on petitioner's tax-exempt status.  It became clear to Mr. O'Donnell that the board did not want to relinquish control of the hospital and that petitioner needed access to the hospital in order to conduct research; these factors limited the options and effectively prevented selling to a third party.  Mr. O'Donnell advised the board on the choice of purchasing entity (e.g., partnership or S corporation) and the associated liability and tax implications for the purchasers.

On November 30, 1981, Mr. O'Donnell, on behalf of petitioner, requested a private letter ruling (PLR) from the Internal Revenue Service (IRS) as to the income tax consequences of a sale of the hospital to a private entity (the request), namely:  (1) Whether petitioner would retain its charitable qualification under section 501(c)(3); (2) whether any unrelated business income would result; and (3) whether the proposed transaction was prohibited by any Code provision, rule, or regulation.  Under "Statement of Facts", the request states:

> 7. Because of the highly specialized nature of the hospital's facilities there is a very limited market for its sale.  Further, the risks and uncertainties related to the operation of the hospital are best understood and therefore subject to evaluation by the Board of Directors of APC [petitioner].  For these reasons, APC has decided to sell the hospital at its appraised value, to its Board of Directors, or an entity which they propose to form, probably a limited partnership.

Under "Description of Proposed Transaction", the request states:

    1. An independent appraisal by a qualified
competent appraiser will be obtained, which
determination will be the basis of the price and terms
upon which the hospital will be sold.

    2. All documents necessary for the closing of the
proposed sale and related consents will be negotiated
and prepared by separate counsel for APC and the
purchasing entity.

*   *   *   *   *   *   *

Following Mr. O'Donnell's recommendation, the board hired

Ray J. Sheldrick (Mr. Sheldrick), a business appraiser, to

determine the fair market value of the hospital.  On March 5,

1982, Mr. Sheldrick submitted to petitioner his Summary Valuation

Report, effective as of September 30, 1981.  Using the asset-

based approach, Mr. Sheldrick determined the fair market value

for the hospital as of September 30, 1981, to be in the range

between $3,500,000 and $4,300,000.  Mr. Sheldrick's appraisal did

not include the Belcher Road property or County Road #77

property.

On May 27, 1982, the IRS issued a PLR to petitioner.  After

reiterating the facts as submitted by petitioner and presenting

the applicable law, the PLR states:

    As noted, arms-length standards will prevail
during the negotiations and sale, as you will certify
by maintaining appropriate records, attesting to the
fact that the price was set at fair market value and
that no loan abatements or other special concessions
will be afforded to the present directors in their
capacity as purchasers and/or operators of the

hospital.  Thus, the proposed sale as described will not benefit those in a controlling position with respect to you by virtue of the ability of such persons to unfairly manipulate the transaction.  The sale will not jeopardize your tax exempt status under section 501(c)(3) of the Code.

On or about February 1983, Mr. O'Donnell assisted in forming Anclote Manor Hospital, Inc. (AMH), a Florida for-profit corporation whose stock was owned by petitioner's board members individually, to purchase petitioner's assets.

On February 8, 1983, petitioner hired Stanley W. Rosenkranz (Mr. Rosenkranz), a partner in the law firm of Holland and Knight, to negotiate the sale of the hospital.  In these negotiations, Mr. O'Donnell represented AMH as buyer and Mr. Rosenkranz represented petitioner as seller.  Both lawyers knew the sale had to be for fair market value.  Both relied in part on Mr. Sheldrick's appraisal in setting the purchase price.  Both knew Mr. Sheldrick's appraisal did not include the Belcher Road or County Road #77 properties.  Negotiations between Mr. Rosenkranz and Mr. O'Donnell continued between February 1983 and April 1983, with the parties exchanging several drafts of a purchase and sale agreement.  Mr. Rosenkranz insisted that AMH assume petitioner's liabilities including the liability for contributions to the pension plans.  He also required that a bank hold the paper and foreclose on the mortgage if the payments were not made.

On April 18, 1983, petitioner's board of directors passed a resolution authorizing the sale of the hospital as negotiated by Mr. O'Donnell and Mr. Rosenkranz. The purchase and sale agreement was executed on April 25, 1983. The property to be exchanged included "all of the * * * [petitioner's] properties, assets, and business as a going concern", but not petitioner's license to conduct or maintain a hospital or those assets considered as restricted funds; i.e., the research, education, and children's psychiatric development funds. In addition, the buyer agreed to lease to petitioner 1,000 square feet of space and allow petitioner access to the premises of the hospital for conducting its research, educational, and charitable functions. At this time, petitioner had not made the renovations necessary for the additional 31 beds approved by the certificate of need.

The agreed purchase price was an amount equal to: (1) $4,500,000, plus (2) the amounts of (a) the liabilities shown on the March 31, 1983, balance sheet then outstanding and (b) those outstanding liabilities incurred in the normal course of business between the date of the March 31, 1983, balance sheet and the closing date, plus (3) to the extent required, the amount to be contributed to petitioner's pension plans of the excess of the plans' actuarial present value of accrued benefits over the assets of the plans. The agreement provided that the liabilities assumed included petitioner's liability for the Florida Patient's

Compensation Fund assessments, but such liability was limited to $114,815, the amount of the liability assessed as of the time of the agreement. The purchase price was to be paid at closing as follows: An executed "Assumption of Liabilities" agreement, a check for $450,000, plus a note for $4,050,000. Closing was held on May 9, 1983, effective May 1, 1983.

The February 28, 1983, Statement of Liabilities attached to the purchase and sale agreement included an accrued expense for "Retirement Fund for Employees (Funding by June 15, 83 [sic], subject to adjustment by actuarial report)" in the amount of $291,320. The attached March 31, 1983, balance sheet showed liabilities of $1,701,786. Petitioner's April 30, 1983 balance sheet showed liabilities of $1,711,549.20.

On June 6, 1983, AMH made a contribution to the pension trust of $171,640 for the plan year ended September 30, 1982. On June 7, 1984, AMH made a contribution of $162,168 for the plan year ended September 30, 1983. AMH terminated one of its defined benefit pension plans effective September 30, 1983, replacing it with a defined contribution plan, and received in excess of $425,000 due to the termination.

In early 1985, AMH sold the Belcher Road property for $375,000 and the County Road #77 property for $1,500,000. During May and June of 1985, AMH received several preliminary offers to buy the hospital; offers ranged from $12 to $26

million.  On July 23, 1985, AMH entered into a contract for the sale of the hospital's operating assets for $29,587,000 to AMISUB (Anclote), Inc., a subsidiary of American Medical International, Inc. (AMI), a large health care provider.  At this time, the hospital was operating at 130 beds and had a certificate of need for an additional 36 beds.  Of the total purchase price, the parties agreed that $3,500,000 was to be placed in escrow to be used for expenses related to the transfer of the 36-bed certificate of need, and that the remaining balance would be released to AMH only if a certificate of need for all 36 beds were approved, otherwise the remaining amount would be prorated based on the number of beds approved.  The closing date was October 21, 1985.  In 1990, AMI sold the hospital for about $4,276,000.

Regulatory Environment

The State of Florida Department of Health and Rehabilitative Services was the granting authority for the license to operate the hospital and the certificates of need.  The hospital's patient revenue and cost charges were subject to review by the State's Hospital Cost Containment Board.

On September 3, 1982, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324.  TEFRA sec. 101(b)(3), 96 Stat. 335, provided in part:

> The Secretary [of Health and Human Services] shall
> develop, in consultation with the Senate Committee on

Finance and the Committee on Ways and Means of the House of Representatives, proposals for legislation which would provide that hospitals, skilled nursing facilities, and, to the extent feasible, other providers, would be reimbursed under title XVIII of this [the Social Security] Act on a prospective basis. The Secretary shall report such proposals to such committees not later than December 31, 1982.

On April 20, 1983, Congress enacted the Social Security Amendments of 1983 (SSA), Pub. L. 98-21, 97 Stat. 63, replacing Medicare's reasonable cost basis payment system for hospital inpatient services with the Diagnosis Related Group (DRG) prospective pay system to be phased-in over a 4-year period with reporting periods beginning after October 1, 1983. SSA, tit. VI, 97 Stat. 149. Under the DRG system, hospitals would receive Medicare payments for inpatient services for each discharge at a specific rate to be determined by the Secretary of Health and Human Services based on DRG's. SSA at sec. 601(e), 97 Stat. 152; see 48 Fed. Reg. 39752, 39754 (Sept. 1, 1983). Congress excluded psychiatric hospitals and distinct psychiatric units from the DRG system. SSA at sec. 601(e), 97 Stat. 152. As a result, hospital care providers increased their interest in providing psychiatric care.

Florida Patient's Compensation Fund

In 1975, the Florida legislature enacted the Medical Malpractice Reform Act of 1975, which was designed to (1) limit liability of medical providers and (2) fund valid claims. The Medical Malpractice Reform Act established the Florida Patient's

Compensation Fund (FPCF) to provide liability coverage in excess of basic policy limits for its participant members.  Each hospital was required to pay a yearly fee and assessments.

Petitioner first became a participant in FPCF sometime during the fund year 1977-78.  Pursuant to the FPCF statute, as in effect in the 1977-78 time frame, petitioner was self-insured for the first $100,000 per claim of liability and any excess liability was to be paid by FPCF.  As of November 30, 1979, petitioner had established a reserve fund of $345,000 for this purpose.  Subsequent to June 30, 1982, petitioner was insured for medical malpractice with a commercial insurance carrier, and the reserve fund reverted to working capital.

FPCF made a series of assessments against its members to cover the deficits arising from the costs of the claims exceeding the membership fees it had collected with respect to a fund year. These assessments represented a proration of the fund deficits among the members based on a formula composed of factors such as type of provider, net fees, and number of providers in each class.  As of September 30, 1982, petitioner had been assessed $58,594 for coverage provided for the fund years 1977-78, 1978-79, and 1981-82, and $56,221 for the fund year 1979-80, for a total of $114,815.

Member hospitals, including petitioner, filed a law suit against the State of Florida Department of Insurance and FPCF in

- 14 -

attempting to prevent collection of the assessments.  On June 9, 1983, the Florida Supreme Court issued its order and, on September 15, 1983, rendered its opinion that the statute governing the FPCF's imposition of fees and assessments was constitutional both on its face and as applied.  Department of Ins. v. Southeast Volusia Hosp. Dist., 438 So. 2d 815 (Fla. 1983).

As of September 30, 1983, the unpaid assessments against petitioner for the fund years 1977-78 through 1981-82 totaled $460,384.  Of this total amount, AMH had assumed liability for $114,815 upon purchase of the hospital.  As of September 30, 1984, the unpaid assessments by FPCF against petitioner for those years totaled $401,709, of which AMH was liable for $56,221.  In addition, petitioner owed interest on these amounts.  On June 20, 1985, petitioner entered a settlement agreement with the FPCP and the State of Florida Department of Insurance for the payment of petitioner's FPCF obligation.  Petitioner made all payments to FPCF in accordance with the settlement agreement.

The total amounts petitioner paid to FPCF during the years in issue were as follows:

| Year | Total Paid |
|------|-----------|
| 1984 | $71,976.76 |
| 1985 | 638,806.22 |
| 1986 | 284,330.46 |
| 1987 | 0 |
| 1988 | 29,764.26 |
| | $1,024,877.70 |

- 15 -

All amounts are attributable to assessments stemming from claims related to the years when petitioner operated the hospital.

Grants to Organizations and for Patient Care

Petitioner gave grants for education, research, and other charitable purposes, and for indigent patient care at the hospital. For 1979 through 1982, petitioner's financial statements reflected the following amounts as "charity, discounts, and provisions for uncollectible accounts" arising from patient care:

| Year | Amounts |
|------|---------|
| 1979 | $212,922 |
| 1980 | 309,862 |
| 1981 | 161,056 |
| 1982 | 116,477 |

Following the sale of the hospital, petitioner made grants totaling the following annual amounts:

| Year | To Organizations | For Patient Care |
|------|------------------|------------------|
| 1984 | $186,817.00 | $184,526.00 |
| 1985 | 700.00 | 138,521.97 |
| 1986 | 47,500.00 | 92,565.00 |
| 1987 | 53,500.00 | 1,500.00 |
| 1988 | 145,784.00 | 0 |

All of the amounts paid for patient care were paid only for the benefit of the patients, none of whom were related to or connected in any way personally with anyone on petitioner's board.

Petitioner's Returns

Petitioner timely filed Forms 990, on the basis of a September 30 fiscal year, for 1982 through 1988 using the accrual method of accounting. On its fiscal 1983 Form 990, petitioner reported the sale of the hospital for a net loss of $1,427,297. Petitioner calculated this loss as follows:

Sale Price    $4,500,000

Basis of Assets sold:

| | | |
|---|---:|---:|
| Cash | $1,268,319 | |
| Treasury bills | 1,231,499 | |
| Patients accounts receivable | 1,023,141 | |
| Other receivables | 7,428 | |
| Supplies | 88,517 | |
| Prepaid expenses | 61,011 | |
| Property, plant, equipment and other non-current assets | 4,022,764 | |
| | $7,702,679 | |
| | | |
| Liabilities assumed by buyer | 1,838,120 | |
| Net assets sold | | 5,864,559 |
| | | (1,364,559) |
| Sales expenses | | 62,738 |
| | | |
| Loss | | (1,427,297) |

For 1983, petitioner reported total revenue of $3,622,160 and total expenses of $4,289,241. Included in the accrued expenses were $1,550 for grants, $20,809 for assistance to individuals, and $354,580 for FPCF assessments. Of the amount accrued for FPCF assessments, $345,000 was unpaid in the year 1983.

Included in the expenses reported by petitioner for the years in issue were the following:

| Year | Grants | Assistance to Individuals | FPCF |
|------|--------|---------------------------|------|
| 1984 | $180,817 | $184,526 | $0 |
| 1985 | 145,073 | 550 | 560,257 |
| 1986 | 47,500 | 92,565 | 862 |
| 1987 | 53,500 | 1,500 | 0 |
| 1988 | 145,784 | 0 | 3,606 |

Revocation and Notice of Deficiency

On December 12, 1991, respondent issued the notice of deficiency and, on the same date, issued the final adverse determination letter revoking petitioner's tax-exempt status effective for all years beginning on or after October 1, 1982. The reasons given for the revocation were that the sale of the hospital resulted in "inurement of your earnings to the benefit of private shareholders or individuals, contrary to the provisions of Code section 501(c)(3)" and

> Additionally, during examination of the Forms 990 which you filed for the taxable years ended September 30, 1985 and 1986, you did not establish that you conducted the charitable, educational, research program which was represented as having been the altruistic goal motivating the sale of your hospital facility. Payments made by you for the provision of patient services, although substantial, were generally restricted to patients of Anclote Manor Hospital who were not shown to have been members of a charitable class. Research and education programs were minimal and poorly documented. There was no evidence that donations made to a variety of public charities, schools, hospitals, and foundations were subjected to any direction or expenditure responsibility.

Based on the revocation of petitioner's tax-exempt status, respondent determined the deficiencies in the Federal income tax.

In the notice of deficiency, respondent calculated petitioner's taxable income as follows:

|  | 1984 | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|---|
| Gross income | $592,299 | $453,356 | $308,705 | $245,814 | $329,843 |
| Operating expense | (159,309) | (137,236) | (77,449) | (83,021) | (105,367) |
| Charitable contributions | (43,299) | (31,612) | (23,126) | (16,279) | (22,448) |
| Total | $389,691 | $284,508 | $208,130 | $146,514 | $202,028 |

In determining petitioner's taxable income, respondent disallowed the deductions reflected on petitioner's Forms 990 for assistance to individuals and payments to the FPCF. Respondent treated petitioner's grants to organizations as charitable contributions but limited those deductions to 10 percent of taxable income.

OPINION

Section 501(c)(3) requires, among other things, that an organization be operated exclusively for one or more specified purposes and that no part of the net earnings of the organization "inures to the benefit of any private shareholder or individual". See also sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. An organization is not operated exclusively for an exempt purpose unless it serves a public rather than a private interest. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. An organization is not operated exclusively for one or more exempt purposes if its net earnings inure in whole or in part to the benefit of private shareholders or individuals. Sec. 1.501(c)(3)-1(c)(2), Income Tax Regs. The words "private shareholder or individual" refer to

persons having a personal and private interest in the activities of the organization.  Sec. 1.501(a)-1(c), Income Tax Regs.

The presence of a single substantial nonexempt purpose destroys the exemption regardless of the number or importance of the exempt purposes.  Better Bus. Bureau v. United States, 326 U.S. 279, 283 (1945); American Campaign Academy v. Commissioner, 92 T.C. 1053, 1065 (1989).  When an organization operates for the benefit of private interests, the organization by definition does not operate exclusively for exempt purposes.  American Campaign Academy v. Commissioner, supra at 1065.  Prohibited benefits may include advantage, profit, or gain.  Id. at 1065-1066.

Fair Market Value

If petitioner sold the hospital to AMH, a corporation whose shareholders were directors of both petitioner and AMH, for less than fair market value, such an advantage to the shareholders of AMH would be a prohibited benefit constituting private inurement.

Fair market value has been defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.  United States v. Cartwright, 411 U.S. 546, 551 (1973); Frazee v. Commissioner, 98 T.C. 554, 562 (1992); see sec. 1.170A-1(c)(2), Income Tax Regs.  The determination of the fair market value of property is a question of fact which must be resolved after

consideration of all of the evidence in the record.  Morris v. Commissioner, 761 F.2d 1195, 1200 (6th Cir. 1985), affg. T.C. Memo. 1982-508; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).

In 1958, respondent determined that petitioner was exempt from Federal income tax as an organization described in section 501(c)(3).  The principal question before us is whether the circumstances of the 1983 sale by petitioner to AMH were such as to confer a prohibited benefit, i.e., inurement, on AMH and therefore on its shareholders, who were directors of both petitioner and AMH, with the result that petitioner should lose its exemption.  At the outset, we think it important to keep in mind the context in which the question arises and the role of fair market value in determining whether such inurement occurred.

This is not an estate or gift tax case where it is necessary to determine a precise amount representing the fair market value of the property transferred in order to determine the amount, if any, subject to tax.  Rather, the question to be resolved is whether the sale was the product of an arm's-length transaction which produced a sale price that is sufficiently close to the fair market value of the property at the time of the sale, so that one can fairly conclude that there was no prohibited inurement.  Or to put it another way, recognizing that what is fair market value presents an inherently imprecise issue (which

even respondent admits), we see our task as one of determining whether the sale price was within a reasonable range of what could be considered fair market values.

In this respect, our task is not unlike that which we face when inurement depends upon a determination whether payments of compensation are excessive or reasonable. See Church of Scientology v. Commissioner, 823 F.2d 1310, 1317 (9th Cir. 1987) ("the payments in this case, cross the line between reasonable and excessive"), affg. 83 T.C. 381 (1984); United Cancer Council, Inc. v. Commissioner, 109 T.C. 326, 396 (1997).[2] The foregoing frame of reference is to be sharply distinguished from the situation involving the issue whether a section 501(c)(3) organization loses its exemption where there is inurement but it is de minimis. See Carter v. United States, 973 F.2d 1479, 1486 n.5 (9th Cir. 1992) (majority opinion), 1489-1490 (Tang, J., concurring in part and dissenting in part); Orange County Agric. Socy., Inc. v. Commissioner, 893 F.2d 529, 534 (2d Cir. 1990), affg. T.C. Memo. 1988-380; Church of Scientology v. Commissioner, supra.

---

[2] Compare also the manner in which the courts have dealt with the relationship between the sales price and fair market value in determining the bona fides of a sale-leaseback transaction. See Brown v. Commissioner, 37 T.C. 461, 486 (1961)(the price "was within a reasonable range"), affd. 325 F.2d 313 (9th Cir. 1963), affd. 380 U.S. 563 (1965); see also Brekke v. Commissioner, 40 T.C. 789, 800 n.5 (1963) and cases cited thereat.

Thus, fair market value plays an important role but is not determinative herein. As a consequence, we reject respondent's insistence that we should determine a definite figure for fair market value which should then be compared with the sale price and automatically measure inurement. Such an approach would accord that value a preciseness it simply does not have. See Messing v. Commissioner, 48 T.C. 502, 512 (1967). On the other hand, we are not prepared to minimize, as petitioner would have us do, the influence of the fair market value element in determining whether the sale price should be treated as the product of arm's-length negotiations, with the absence of inurement the result.

## Burden of Proof and Evidentiary Matters

There is one further preliminary matter. In an earlier proceeding in this case, we decided that petitioner had made a proper request for a determination in respect of its exemption under section 501(c)(3), within the meaning of section 7428(b)(2), that respondent had failed to make a determination with respect to such request, and that petitioner had filed a proper and timely petition for a declaratory judgment so that all the jurisdictional requirements prescribed by section 7428 had been satisfied. Anclote Psychiatric Ctr., Inc. v. Commissioner, 98 T.C. 374 (1992) (docket No. 19530-91X). Given our conclusion that respondent had not made the required determination, the

burden of proof is on respondent with respect to the issue of whether petitioner is entitled to an exemption under section 501(c)(3).[3]  Rule 217(c)(2)(B); see also infra pp. 29-30.  As to all other issues raised by the deficiency notice, petitioner has that burden.  Rule 142(a).

It is against the foregoing background that we proceed to examine the various elements of the 1983 sale, in order to determine whether fair market value of petitioner's assets as compared to the sales price "cross[es] the line between reasonable and excessive".  See Church of Scientology v. Commissioner, supra.

We see no purpose to be served by setting forth in detail the various steps in the negotiations between petitioner and AMH which culminated in the 1983 sale.  Both parties were represented by counsel who, as far as the legal as distinguished from the financial aspects of the sale were concerned, acted independently and in good faith and sought to protect the interests of his

---

[3]  Respondent has accepted this burden and proceeded accordingly at trial but has reserved the right to reassert its position that we were without jurisdiction in Anclote Psychiatric Center v. Commissioner, 98 T.C. 374 (1992) (docket No. 19530-91X).  We also note that there are two other docketed cases involving the revocation of petitioner's sec. 501(c)(3) status; i.e., docket Nos. 4833-92X (petition for declaratory judgment after revocation letter issued) and 27403-92X (petition for declaratory judgment that petitioner qualifies as tax-exempt in years subsequent to the sale).  None of the cases referred to in this footnote have been consolidated with the instant case.  See Fazi v. Commissioner, 102 T.C. 695, 696 n.1 (1994).

client.  As will subsequently appear, however, there are serious questions as to the extent to which the negotiations adequately took into account certain financial aspects of the transaction which may cause the negotiations and the resulting sale price to be categorized as not being at arm's length and therefore giving rise to inurement.  Among the elements involved are consideration or lack of consideration given to the changes in values of items reflected in petitioner's balance sheet between September 30, 1981, and May 8, 1983, the proper valuations of the Belcher Road and County Road #77 parcels, the measure of petitioner's obligations under its pension plan, the value, if any, of the certificate of need for 31 additional beds, and the impact of changes in methods of reimbursement in respect of Medicare reimbursements and of the sales of the hospital in 1985 and 1990. These elements bear directly on the determination of the range of fair market values and consequent inurement, if any.

An element in resolving the question of fair market value, and therefore inurement, is the extent to which evidence as to events and actions occurring after the date of the 1983 sale can be taken into account.  Petitioner has raised a number of objections to such evidence, particularly the evidence relating to the 1985 sale of the property and the circumstances surrounding such sale, on the ground of relevancy.

Rule 402 of the Federal Rules of Evidence, rules that apply to this Court under Rule 143(a), Tax Court Rules of Practice and Procedures, provides generally that all relevant evidence is admissible and that evidence which is not relevant is not admissible. Rule 401 of the Federal Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

In examining all the facts and circumstances involved in determining fair market value, events occurring subsequent to the valuation date are not considered, except to the extent that such events were reasonably foreseeable on the valuation date. First Natl. Bank of Kenosha v. United States, 763 F.2d 891, 894 (7th Cir. 1985); Estate of Spruill v. Commissioner, 88 T.C. 1197, 1228 (1987). However, the price set by a freely negotiated agreement made reasonably close to the valuation date is persuasive evidence of fair market value, except where a material change in circumstances occurs between the valuation date and the date of sale. First Natl. Bank of Kenosha v. United States, supra at 894; Estate of Spruill v. Commissioner, supra at 1233. A useful distinction may be drawn between later events which affect fair market value as of the valuation date, and later events which may be taken into account as evidence of fair market value as of the

valuation date.  Estate of Jung v. Commissioner, 101 T.C. 412, 431 (1993).  In short, evidence as to latter category of events may be admitted because of its potential relevance even though it may ultimately be determined that such evidence does not have an impact on the determination of fair market value.

Here again, we see no purpose to be served by analyzing each stipulation, exhibit, or testimony relating to post-May 1983 events.  These items include matters not only relating to the 1985 and 1990 sales of the hospital, but also the payments made to and from petitioner's pension plan which was transferred as part of the 1983 sale, sales of the Belcher Road and County Road #77 parcels, and the AMH 1984 audit report.  We think it sufficient to observe that the evidence to which petitioner objects may be relevant to our determination herein, i.e., to the extent that other evidence could provide a basis for concluding that the elements which impacted the 1985 sale may have been sufficiently known or anticipated at the time of the 1983 sale.  We previously ruled twice that such evidence was admissible, reserving to petitioner the right to reargue its position on brief.  This petitioner has done, but we remain unpersuaded.  Accordingly, petitioner's objections to evidence relating to post-1983 events are overruled.  We likewise overrule petitioner's objections to the other described material on the

ground that such material may provide information relevant to our determination of whether there was inurement.

The parties primarily rely upon their experts' testimony and reports to support their respective positions regarding the fair market value of the hospital. Expert opinion sometimes aids the Court in determining valuation; other times, it does not. See Laureys v. Commissioner, 92 T.C. 101, 129 (1989). We evaluate such opinions in light of the demonstrated qualifications of the expert and all other evidence of value in the record. Estate of Newhouse v. Commissioner, 94 T.C. at 217. We are not bound, however, by the opinion of any expert witness when that opinion contravenes our judgment. Id. We may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), or we may be selective in the use of any portion thereof, Parker v. Commissioner, 86 T.C. 547, 562 (1986).

Initially, we deal with petitioner's objection to the admission of the report of respondent's expert, Mr. Shelton, on the ground that he assumed the role of an advocate. See Laureys v. Commissioner, supra. Petitioner points to Mr. Shelton's use of terms such as "collusion", "in secrecy", "the closed and secret sale", and "inside knowledge", when describing the appraisal of Mr. Sheldrick and AMH's purchase of the hospital. That appraisal was utilized by Messrs. O'Donnell and Rosenkranz

- 28 -

in their negotiations which culminated in the 1983 sale.
Additionally, when analyzing petitioner's revenues and expenses
for purposes of the income approach to valuation set forth in his
appraisal, Mr. Shelton states:

> Prior to the sale, and at the time when the hospital
> was owned by a not-for-profit organization, maximizing
> patient revenues per patient day and net income were
> not priority matters as they were consumed with their
> "totally in-secret plans" to purchase the hospital.
> However, the Board did not want to do anything to make
> the contemplated sale suspect as the members of the
> board covertly made preparations to sell the hospital
> to themselves.  Thus expenses in the years immediately
> prior to and in the year of sale were higher than
> normal because of fees and costs related to the
> preparation and the related sale expenses.

Finally, in his overall conclusion, Mr. Shelton states that the
Board of Directors of petitioner "covertly schemed and planned
the successful purchase of the hospital to their inurement and at
the expense of this 501(c)(3) corporation".

We think that Mr. Shelton's report is more characteristic of
the work of a revenue agent than of an impartial, disinterested
appraiser.  In this connection, we note that Mr. Shelton's report
was received and adjusted by respondent's National Office.  We
reject respondent's suggestion that we exclude Mr. Shelton's
objectionable comments and admit the balance of his report.
Those comments impart a pervasive negative impact on the report.
We conclude that petitioner's objection based on bias is well

founded and accordingly rule that Mr. Shelton's report should not
be received in evidence.  Cf. Laureys v. Commissioner, supra.

Our conclusion makes it unnecessary for us to rule on
petitioner's further objection to the admission of Mr. Shelton's
report on the ground that it is significantly inadequate,
particularly in respect of his use of comparables.  We are
constrained to add that, even if we had decided to overrule
petitioner's objections and admit Mr. Shelton's report into
evidence, we would have given it minimal weight because of Mr.
Shelton's inexperience at the time of his appraisal, the defects
in the report, such as listing a claimed comparable sale as
having taken place in 1983 instead of 1985, the value he ascribes
to the impact of the change in the Medicare system in 1983, the
failure to take into account the impact of income taxes on his
projected income stream (only partially corrected by the
subsequent adjustment of the report by respondent's National
Office), the internal contradictions reflected in his analysis of
projected profitability, and the seeming excessive value for
goodwill.  See Furman v. Commissioner, T.C. Memo. 1998-157.

Mr. Shelton's report represented the bulk of respondent's
case, and its exclusion raises the question of the impact of its
inadmissibility on respondent's burden of proof.  The case law is
clear that the determination whether that burden has been
satisfied is not limited to respondent's affirmative evidence but

can be made on the basis of the whole record.  See <u>Clark v. Commissioner</u>, 266 F.2d 698, 717 (9th Cir. 1959), remanding on other grounds T.C. Memo. 1957-129; <u>Coleman v. Commissioner</u>, 87 T.C. 178, 200 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987); <u>Imburgia v. Commissioner</u>, 22 T.C. 1002, 1014 (1954).  Accordingly, we proceed with our task on the basis of the record herein in its entirety.

<u>Inurement</u>

We first address the question of how much AMH paid petitioner for the assets which petitioner sold to it in May 1983.  The agreement of sale provided:

>    2.  <u>Purchase Price</u>.
>
>    Buyer and Seller agree that the total purchase price (the "Purchase Price") to be paid for all property, assets and business being acquired hereunder shall be an amount equal to the sum of (i) $4,500,000 and (ii) the sum of (x) the amount of all liabilities shown on the 1983 Balance Sheet and not heretofore paid or discharged, (y) the amount of all liabilities incurred by the Seller in the ordinary course of its business, between the date of the 1983 Balance Sheet and the Closing Date, and not heretofore paid or discharged, and (iii) to the extent the same is required to be contributed to said plans, the excess of total actuarial present value of accrued benefits over the assets of the Seller's pension plans, (the amounts referred to in (ii) and (iii) being sometimes hereinafter collectively referred to as the "Assumed Liabilities").  Anything herein contained to the contrary notwithstanding, there shall be deemed included within the amount of Assumed Liabilities, the Seller's liability for Florida Patient's Compensation Fund Assessments; provided, however, that Buyer shall not be deemed to have assumed, and therefore the same is not deemed within the Assumed Liabilities, liability for Florida Patient's Compensation Fund assessments to the extent the same exceed $114,815.

The parties appear to be in agreement that the purchase price was at least $6,338,120 consisting of $4.5 million payable by way of cash and a promissory note plus $1,838,120 of assumed liabilities. They differ on whether the latter amount includes some $300,000 claimed to represent petitioner's liability to its pension funds as of May 8, 1983, in respect of the excess of vested benefits over net assets in the funds. Petitioner asserts that such amount should not be so included but rather should be added to the foregoing amount of assumed liabilities. Petitioner's position finds support in the separate treatment accorded this item in the above-quoted excerpt from the sale agreement. Further support for petitioner's position can be found in Mr. Sheldrick's report[4] which clearly indicates that this liability is an off-the-balance-sheet item, and in footnote G to petitioner's September 30, 1982, audit report. On the other hand, petitioner's Form 990 for the fiscal year ended September 30, 1983, shows liabilities of $1,838,120 as part of the basis used in computing the claimed loss from the sale to AMH. It is difficult to reconcile this figure with the figure of $1,711,549 which is the updated total amount of liabilities shown on

---

[4] We note that, since Mr. Sheldrick was deceased at the time of trial, his report was not admitted as an expert report but is part of the record because it was utilized by Messrs. O'Donnell and Rosenkranz as a basis for their negotiations.

petitioner's April 30, 1983, balance sheet.[5]  Additional
difficulties arise when one takes into account that AMH, on
June 4, 1983, paid $171,640 in respect of September 30, 1982,
plan year and on June 7, 1984, paid $162,168 in respect of
September 30, 1983, plan year.  To be sure, as petitioner points
out, neither of these figures was available on May 8, 1983 (the
closing date of the purchase and sale agreement), but the
$171,640 figure was available when petitioner's Form 990 for its
September 30, 1983, fiscal year was filed and presumably could
have been included in the amount of assumed liabilities; had this
been done, the amount of such liabilities would have exceeded the
amount shown on the Form 990 ($1,883,188 without taking into
account the net increase, if any, of liabilities incurred between
April 30, 1983, and the May 8, 1983, closing date).  As will
subsequently appear, whether or not the $6,338,120, which
respondent appears to accept as the purchase price, is increased
by the amount of the liability in question will not be critical
in deciding the inurement question.  We reject respondent's
argument that there was an overfunding of the pension plans and
therefore there is no liability to be taken into account.  The
overfunding, upon which respondent relies, appears to relate to
the calculations applicable when a plan is being terminated which

---

[5]  The comparable figure in the Mar. 31, 1983, balance sheet
annexed to the purchase and sale agreement was $1,701,702.

are different from those which determine the liability for contributions.  In any event, there is insufficient evidence in the record to satisfy respondent's burden of proof in this aspect of the inurement issue.  On this basis, we accept the testimony of Messrs. O'Donnell and Rosenkranz that they thought the figure was approximately $300,000 and that this was the figure they used in the negotiations.[6]  As a result, we conclude that the purchase price should be $6,638,120.

The next question is what was the value of the assets transferred by petitioner to AMH.  We think that the best way to approach this question is to take the September 30, 1981, balance sheet which was Mr. Sheldrick's starting point and make three adjustments to reflect:  (1) The increase in the amount of cash and Treasury bills; (2) Mr. Sheldrick's adjustment of $280,000 to reflect an increase in the value of the hospital land; and (3) the values of the Belcher Road and County Road #77 real estate above the value of $581,153 at which they were carried on petitioner's books.[7]  If these three adjustments produce an

---

[6]  This round figure is quite close to the actual payments by AMH; i.e., $171,640 for fiscal 1982 and $97,945 (the pro rata portion of fiscal 1983 payment for the period prior to sale - 220/365 x $162,168), or $269,583.

[7]  We have concluded that $60,000 attributable to the value of two vacant lots should not be a separate item because it may well be that these lots were included in Mr. Shelton's valuation of the hospital's land, buildings, and improvements.

excess of asset values over the purchase price which falls

outside a reasonable range of values as related to purchase

price, the conclusion that there was inurement will follow and no

further analysis will be necessary.

In respect of the first adjustment, the following figures

(in thousands of dollars rounded) are revealing:

| Date | Cash and Treasury bills | Increase Over 9/30/81 | Book Value Assets | Increase Over 9/30/81 |
|------|------|------|------|------|
| 9/30/81 | $823 | | $6,092 | |
| 9/30/82 | 1,538 | $715 | 6,559 | $467 |
| 3/31/83 | 2,206 | 1,383 | 7,090 | 998 |
| 4/30/83 | 2,499 | 1,676 | 7,237 | 1,145 |

It is apparent that between September 30, 1981, and the

May 8, 1983, closing date, there was an increase of approximately

$1.1 million in assets (or $1 million if one is guided by the

March 31, 1983, value reflected in the purchase and sale

agreement), assets as to which there can be no question as to

their values as of the pertinent dates and their liquidity at

those values.  The significance of these increases is confirmed

when one takes into account that balance sheet liabilities (in

thousands of dollars rounded) remained relatively unchanged:

| Date | Amount |
|------|------|
| 9/30/81 | $1,502 |
| 9/30/82 | 1,831 |
| 3/31/83 | 1,702 |
| 4/30/83 | 1,712 |

The second adjustment is an increase over book value of $280,000 as of September 30, 1981, which Mr. Sheldrick made in order to reflect what he considered to be the fair market value of the land, buildings, and improvements of the central hospital complex. In this connection, we note that there is insufficient evidence in the record for us to arrive at any additional amount of such adjustment as of the closing date.

Finally, we note that Mr. Sheldrick excluded from his valuation of petitioner any consideration of the real estate not in use and the $581,153 reflected for such real estate on petitioner's books. This fact was apparently inadequately considered, by Messrs. O'Donnell and Rosenkranz in their negotiations and by petitioner's officers and directors, a defect which is significant in light of the availability of the appraisals dated March 2, 1981, and July 8, 1982, made for petitioner by Herbert Blanton which valued such land as follows:

| Property | Amount |
|---|---|
| County Road #77 | $ 836,000 |
| Belcher Road | 210,000 |
| Total | $1,046,000 |

If one adds the increase of $464,847 ($1,046,000 less $581,153 reflected for such real estate on petitioner's

September 30, 1981, balance sheet)[8] and the $280,000 adjustment made by Mr. Sheldrick in respect of the value of the hospital complex, or a total of approximately $745,000, to the asset values as of March 31, 1983, see supra p. 33, which reflected the changes in the values of the cash and Treasury bills, one arrives at a figure of $7,835,000 as the indicated fair market value of the assets transferred.

Comparing this figure with the $6,638,120 purchase price, see supra p. 33, it is apparent that the sale price was almost $1,200,000 less than the fair market value of the assets acquired.  This is a substantial amount in relation to the purchase price and causes us to conclude that the $7,835,000 falls outside the upper limit of any reasonable range of fair market values.[9]  We reach the same conclusion when one compares the increase in the net worth of petitioner adjusted to take into account the $300,000 additional liability to the pension funds, with the similarly adjusted net worth reflected in petitioner's September 30, 1981 balance sheet.  This increase is $798,000 (not

---

[8]  We note that the Belcher Road property was sold on Feb. 15, 1985, for $375,000 and County Road #77 property on Mar. 15, 1985, for $1,500,000, or a total of $1,875,000.  This would indicate that our use of $1,046,000, which is over $800,000 less, may unduly favor petitioner.

[9]  We note that the gap between sale price and asset value would have been even greater if we had not resolved the $300,000 pension liability question in petitioner's favor.

taking into account the further increase attributable to the month ending April 30, 1983)[10] which when added to the aforementioned increase of $745,000 related to petitioner's real estate produces a net increase of $1,543,000. Finally, we note that, in addition to the likelihood of increased values for the hospital complex land and the unimproved real estate, see supra notes 7 and 8, we have not sought to include the values, if any, attaching to the certificate of need for an additional 31 beds, the enhanced value, if any, of petitioner, as a long-term psychiatric hospital facility, attaching to the exemption of psychiatric hospitals from the anticipated changes in Medicare reimbursement standards which occurred later in 1983 but stemmed from legislation antedating the May 1983 sale, or to the fact that the hospital was resold in 1985 for some $29 million. We also find it unnecessary to attempt to consider the impact of a prohibition against sale for a 2-year period, which was present

---

[10] Adjusted Net Worth (in thousands):

| Date | Adjusted Net Worth | Increase Over 9/30/81 |
|------|--------------------|-----------------------|
| 9/30/81 | $4,290 | |
| 9/30/82 | 4,428 | $138 |
| 3/31/83 | 5,088 | 798 |
| 4/30/83 | 5,225 | 935 |

in the drafts but somehow was omitted in the final purchase and sale agreement.

Under the foregoing circumstances, we find it unnecessary to engage in any detailed analysis of the report of petitioner's expert, Mr. Mard, who arrived at a fair market value of $6,588,000, approximately $200,000 more than petitioner reported as the purchase price on its Form 990 for the fiscal year ended September 30, 1983.  We think it appropriate to note, however, that we examined his report and testimony sufficiently to conclude that his analysis would probably require adjustment which would produce a fair market value of at least $7 million, an amount not insignificantly in excess of the $6.638 million purchase price we have accepted and an even greater excess over the $6.338 million figure shown on petitioner's above-mentioned Form 990.

The long and the short of the matter is that the negotiations between Mr. O'Donnell and Mr. Rosenkranz were fatally flawed because of their apparent failure to take into account the obvious and substantial adjustments to Mr. Sheldrick's appraisal as of September 30, 1981, in respect of changes between that date and March 31, 1983.[11]  Petitioner's

[11]  The record contains numerous indications of such failure either directly or inferentially from their inability to recall significant aspects of the May 1983 sale.  One example is
(continued...)

effort to avoid this consequence by arguing that Mr. Sheldrick's report satisfied the independent appraisal condition of respondent's private letter ruling, see supra p. 7, is clearly without merit. Nothing in that condition can be construed as validating an appraisal which was more than 18 months old at the time of the closing of the transaction to which the ruling relates.

We hold that respondent has satisfied the burden of proving that the May 1983 sale by petitioner to AMH resulted in a prohibited inurement and that petitioner was not an exempt organization under section 501(c)(3) during the years at issue.

Exempt Activities for 1985 and 1986

Our holding makes it unnecessary to consider respondent's alternative argument that, even if petitioner continued to be exempt after October 1, 1982, it lost its exemption in fiscal

---

[11](...continued)
reflected in the following testimony of Mr. Rosenkranz with respect to the Belcher Road and County #77 Road properties:

Q. Mr. Rosenkranz, did -- by the conclusion of this transaction, did you satisfy yourself that the two parcels of land, that component of this entire transaction, was subsumed within the purchase price that was ultimately agreed upon?

A. I have no recollection.

Q. One way or the other?

A. I have no recollection one way or the other.

1985 and 1986 because the major portion of its expenditures during those years, namely, payments to FPCF and to AMH for patient care, constituted prohibited inurement to the board members.  Petitioner also treats respondent's argument as an alternative and does not ask us to grant it exempt status during the aforesaid years if we conclude, as we do, that it lost such status at an earlier date.  In this connection, petitioner points out that this issue is subsumed in the issues involved in docket No. 27403-92X wherein petitioner filed a petition, in response to respondent's action in respect of its request for exempt status after October 1, 1983, seeking a declaratory judgment that it was exempt in the years after the sale.

We now turn to the question of whether petitioner, as a taxable entity during the years at issue herein, is entitled to certain deductions in computing its taxable income.  These deductions are for amounts due FPCF, for grants to organizations and patient care and for a claimed net operating loss carryforward from its 1983 fiscal year.

FPCF

Petitioner had contingent liabilities to the FPCF at various times during its fiscal year 1983 and subsequent taxable years with respect to its hospital activities prior to the May 1983 sale.  The deductibility of those liabilities to the extent that they became fixed or paid during the years is at issue herein.

First, respondent seems to argue that petitioner is not entitled to any deduction because it was no longer in the hospital business to which the expenses attached at the time of payment or accrual.  This position is without merit.  It has long been established that, if an expense relates to a trade or business, a taxpayer is still entitled to a deduction for payment in a later year even though the taxpayer is no longer engaged in that trade or business.  Dowd v. Commissioner, 68 T.C. 294, 301 (1977); Burrows v. Commissioner, 38 B.T.A. 236, 238 (1938).

Second, given that the FPCF payments related back to petitioner's hospital business prior to May 1983, what is the impact of the fact that, at that time, petitioner was exempt under section 501(c)(3)?  Respondent argues that this exempt status precludes petitioner from claiming the deductions under section 162(a) because such deductions are precluded by section 265(1),[12] which denies deductions allocable to tax-exempt income and, as provided in sections 161 and 261, has priority over section 162(a).  Petitioner's argument fails to take into account

_____

[12] Sec. 265(1) (now sec. 265(a)(1)) provides:

No deduction shall be allowed for--

> (1)  Expenses.--Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this subtitle  * * *

the tax-exempt status of petitioner during the periods to which the FPCF expenses relate and completely ignores section 265(1).

Petitioner's position is, to say the least, curious. On the one hand, it utilizes the relation-back argument in order to relate the FPCF liabilities to its earlier income-producing hospital activities since its activities during the years at issue could not be considered a trade or business within the meaning of section 162(a). On the other hand, it rejects any relation back to take into account that the income produced by its hospital activities was exempt from tax because of its section 501(c)(3) status. This it may not do.

We are satisfied that the FPCF liabilities are allocable to petitioner's hospital income in the periods prior to the sale of the hospital and that section 265(1) applies. That being the case, the fact that those payments might have been deductible under section 162(a) had petitioner's hospital business produced taxable income becomes irrelevant since section 265(1) prevails over section 162(a) by disallowing deductions falling within its ambit which are "otherwise allowable". See supra note 12; see also Stroud v. United States, 906 F. Supp. 990, 996 (D.S.C. 1995), affd. in part and vacated in part without published opinion 94 F.3d 642 (4th Cir. 1996); Rickard v. Commissioner, 88 T.C. 188, 193-194 (1987). The fact that the nontaxability of the hospital income derived from petitioner's status rather than from

the character of the income as such does not prevent the application of section 265(1). As we stated in <u>Rickard v. Commissioner</u>, <u>supra</u> at 193-194, where the tax exemption attaching to the taxpayer's farm income derived from his status as an Indian and the location of the farm on Indian land:

> The legislative purpose behind section 265 is abundantly clear: Congress sought to prevent taxpayers from reaping a double tax benefit by using expenses attributable to tax-exempt income to offset other sources of taxable income. <u>Manocchio v. Commissioner</u>, 78 T.C. 989, 997 (1982), affd. 710 F.2d 1400 (9th Cir. 1983). More importantly, the Supreme Court has concluded that Congress intended to limit deductions to those expenses related to taxed income. <u>Rockford Life Insurance Co. v. Commissioner</u>, 292 U.S. 382 (1934). * * * [Fn. refs. omitted.]

Nor is it relevant that the tax-exempt income to which FPCF relates was earned by petitioner in an earlier year. In <u>Stroud v. United States</u>, <u>supra</u>, the taxpayer was denied a deduction for amounts paid in the taxable year because of a breach of contract to provide medical service in return for a tax-exempt scholarship received in an earlier year.

We hold that the FPCF payments in question are not deductible.

<u>Grants to Organizations and for Patient Care</u>

Respondent disallowed further deductions for petitioner's grants to charitable organizations because of the limit contained in section 170(b)(2), which provides that a corporation's deductions for charitable contributions may not exceed 10 percent

of the taxpayer's taxable income. Petitioner does not dispute the 10-percent limitation if we sustain the revocation of its tax-exempt status. Respondent also disallowed the grants for patient care on the basis that the patients were not eligible donees as specified in section 170(c). We agree with respondent that the grants for patient care are not eligible charitable contributions. Petitioner's reference to Rev. Rul. 56-304, 1956-2 C.B. 306, which provides the basis for allowing section 501(c)(3) organizations to distribute funds to individuals, is misplaced. That ruling assumes that the taxpayer is tax exempt, which is not the case during the taxable years involved herein. Thus, we sustain respondent's determination of the amounts allowed for charitable deductions.[13]

Net Operating Loss Carryover From 1983

At the outset, we note the facts that the taxable year 1983 is not before us or that it may be a barred year do not preclude us from considering that year for carryforward to the taxable years at issue herein. See Hill v. Commissioner, 95 T.C. 437, 440 (1990).

---

[13] For 1985, petitioner reported grants to organizations as $145,073 and to individuals as $550, whereas the parties agree that petitioner gave $700 to organizations and $138,521.97 for patient care. Since respondent has not requested an increase in the deficiency, we sustain the amounts respondent originally allowed.

Petitioner argues that it should be allowed a net operating loss carryforward from 1983 of $706,522.  Respondent argues that petitioner has no loss for 1983 because:  (1) the $1,427,297 loss reported on the sale of the hospital was a capital loss, the deduction of which is limited to capital gain under section 1211(a), or zero in this case, and (2) the $354,580 FPCF expense is not deductible.  In the alternative, if any loss is allowable on the hospital sale, respondent points out certain discrepancies between the amounts used to calculate the loss on the sale as reported on the return and those on petitioner's earlier financial statements. Petitioner's response to respondent's capital loss limitation argument is that the assets of the hospital must be analyzed separately to determine their nature as capital or ordinary items.  Having made that analysis, petitioner then allocates the sales price among those assets in order to measure the extent of its deductible loss.  Petitioner recognizes that capital losses can only be carried forward against capital gains.  See sec. 1212(a)(1).  As a result, petitioner will not benefit from any portion of its claimed loss which is a capital loss because it had no capital gains during the taxable years before us.

The sale of a business involves the sale of its assets.  The nature of its assets determines the nature of the gain or loss. The purchase price must be allocated among the assets sold based

on their fair market value and then the gain or loss on the individual assets determined. Other than the assets of cash and Treasury bills, the record before us contains little information with which to ascertain the fair market value of the individual assets. In this connection, we note that any such allocation would require us to determine specific fair market values in contrast to the range standard which we were able to apply in respect of the inurement issue.

Petitioner's allocation of the purchase price has several defects, one of which is that it is based upon book values of assets rather than fair market values. In any event, we have increased the purchase price, and therefore decreased petitioner's loss by $300,000 representing obligations to petitioner's pension plans assumed by AMH. We have also determined that the FPCF expenses are not deductible in the post-1983 years, and the same reasoning applies to the $354,580 reported as an FPCF item on the Form 990 for fiscal 1983. These two adjustments total $654,880 and reduce petitioner's claimed loss to $51,942. We are satisfied that a sufficient portion of the loss on the sale of the hospital would be capital so as to eliminate any remaining loss, if there was a loss at all. Regardless, petitioner has not met its burden of proving, see supra p. 21, that it had a net operating loss for 1983.

In keeping with the above holdings,

<u>Decision will be entered</u>

<u>for respondent</u>.