FILED
United States Court of Appeals
Tenth Circuit

**March 7, 2014**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

ESGAR CORPORATION; DELMAR
L. HOLMES; PATRICIA A.
HOLMES; GEORGE H. TEMPEL;
GEORGETTA TEMPEL,

      Petitioners - Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE,

      Respondent - Appellee.

No. 12-9009

---

**APPEAL FROM THE UNITED STATES TAX COURT**
**(T.C. Nos. 1:23676-08; 1:23688-08; 1:23689-08)**

---

James Walker (and Justin D. Cumming of Rothgerber, Johnson & Lyons, L.L.P.,
on the briefs), Denver, Colorado, for Petitioners - Appellants.

Jennifer Rubin (Kenneth L. Greene, Tax Division of Department of Justice, and
Kathryn Keneally, Assistant Attorney General, on the brief), Washington, D.C.,
for Respondent - Appellee.

---

Before **KELLY**, **GORSUCH**, and **HOLMES**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

      Petitioners - Appellants Esgar Corporation, George and Georgetta Tempel,

and Delmar and Patricia Holmes (collectively, the "Taxpayers") appeal from two decisions of the United States Tax Court. Esgar Corp. v. Comm'r, 103 T.C.M. (CCH) 1185, 2012 WL 371809 (T.C. 2012); Tempel v. Comm'r, 136 T.C. 341 (T.C. 2011). They argue that the Tax Court erred in valuing conservation easements they claimed as charitable deductions and in determining the holding period of state tax credits they sold. Our jurisdiction arises under I.R.C. § 7482,[1] and we affirm.

Background

In 1987, Esgar, the Holmeses, the Tempels, and Kelling Fine Foods, Inc., each acquired an undivided, one-fourth interest in roughly 2,200 acres of land in Prowers County, Colorado. Esgar Corp., 2012 WL 371809, at *2. They acquired and held the land in partnership. Around 1999, the partnership leased 1,470 acres of the property to Eastern Colorado Aggregates to operate as a gravel mine. Id. at *3. The mine, known as the Midwestern Farms Pit, is one of the four largest aggregate[2] mines in Prowers County. Id.

In December 2004, the partnership transferred approximately 163 of the

---

[1] All citations to the Internal Revenue Code ("I.R.C.") refer to United States Code, Title 26.

[2] Aggregate is material "consisting largely of rock, gravel, and sand" used in construction or as an ingredient in making concrete. Pioneer Gravel Equip. Mfg. v. Diamond Iron Works, 72 F.2d 161, 161 (8th Cir. 1934).

non-leased acres to the Taxpayers individually.  Id. at *4.  When all was said and done, Esgar and the Tempels each owned 54.34 acres, and the Holmeses owned 54.35 acres of land adjacent to the Midwestern Farms Pit.  Id.  On December 17, 2004, the Taxpayers each donated a conservation easement over their respective property to the Greenlands Reserve.  Id. at *5.  The donations granted a perpetual easement over the properties, giving Greenlands the right to preserve the natural condition of the land and protect its biological, ecological, and environmental characteristics.  Id.  The grant specifically prohibited the mining of sand, gravel, rock, or any other minerals on the properties.  Id.

The Taxpayers claimed charitable deductions on their 2004, 2005, and 2006 tax returns for "qualified conservation contributions" under I.R.C. § 170(f)(3)(B)(iii).  Id.  The Taxpayers engaged William Milenski to appraise their contributions.  Mr. Milenski concluded that, had the conservation easements not been granted, the properties would have realized their greatest potential as a gravel mining operation.  Id.  Based on the value of that relinquished use, Mr. Milenski valued Esgar's donated conservation easement at $570,500, the Holmeses' at $867,500, and the Tempels' at $836,500.  Id.  The Taxpayers claimed these amounts as charitable contributions on their respective 2004 tax returns, deducting what they could and carrying the remainder forward onto their 2005 and 2006 returns.  Id.

Also as a result of their donations, the Taxpayers received transferable tax

- 3 -

credits from the State of Colorado. Tempel, 136 T.C. at 342. Between December 22 and 31, 2004—within two weeks of receiving the credits—the Taxpayers sold portions of their credits to third parties. Id. at 343. From these sales, Esgar received net proceeds of $18,000, the Tempels received net proceeds of $82,500, and the Holmeses received net proceeds of $164,625. Id.; Stip. of Facts at 11 ¶¶47-49. On their respective 2004 tax returns, the Taxpayers reported these proceeds as income, albeit each differently: Esgar reported the income as a long-term capital gain; the Tempels reported it as a short-term capital gain; and the Holmeses reported it as ordinary income. Tempel, 136 T.C. at 343; Stip. of Facts at 12 ¶54, 15 ¶67, 16 ¶75.

After an audit of the Taxpayers' 2004, 2005, and 2006 returns, the Commissioner determined that the Taxpayers' conservation easements were in fact valueless and that the sales proceeds from their state tax credits should be reported as ordinary income. The Commissioner issued notices of deficiency for the 2004, 2005, and 2006 tax years. The notices indicated that Esgar, the Holmeses, and the Tempels had understated their tax liability for those years by $32,357, $82,296, and $93,681, respectively. Esgar Corp., 2012 WL 371809, at *1. The Taxpayers challenged these notices in the United States Tax Court, and a three-day trial was held in Denver, Colorado, in November 2009.

In the Tax Court, the Commissioner did not challenge whether the conservation easements were deductible "qualified conservation contributions"

- 4 -

under I.R.C. § 170(h).  Rather, the only issue was the easements' value.

Concerning valuation methodology, the parties agreed that there were no

comparable sales of easements with which to compare the Taxpayers' donations.

Thus, the parties agreed on "before and after" valuation.[3]  The Taxpayers and the

Commissioner agreed that the after value of the Esgar and Tempel properties was

$24,000, and the after value of the Holmes property was $27,000.  Id. at *7.

Their disagreement, and thus the trial, centered around the properties' before

value.

The Tax Court noted that a property's "highest and best use" determines its

before value.  Id.  The Taxpayers argued that their properties' highest and best

use before granting the easements was gravel mining; the Commissioner argued

that it was agriculture.[4]  Id.  To this end, both sides introduced reports and

testimony from various experts.  Id. at *8-14.  Taking into account these experts,

the Tax Court sided with the Commissioner's conclusion that agriculture was the

properties' highest and best use.  Id. at *15.  This conclusion was based in part on

a finding that, although "it would have been physically possible to mine the

---

[3]  Discussed in more detail below, the before and after method measures a conservation easement's value as the difference between the property's fair market value before granting the easement and the property's fair market value after being so encumbered.

[4]  The properties had historically been used as farmland; however, the parties stipulated that, absent the conservation easements, it was likely that the necessary permits to mine gravel could be obtained.  Esgar Corp., 2012 WL 371809, at *4.

properties in 2004 (or in the future)," there was no demand for such use "in the reasonably foreseeable future." Id. at *19. The Tax Court then decided the properties' before value based on comparable sales of agricultural lots. It concluded that the before value of the Esgar and Tempel properties was $73,774, and the before value of the Holmes property was $76,502.50. Id. at *22. After subtracting the properties' after values, the Tax Court valued the Esgar and Tempel conservation easements at $49,774, and the Holmes conservation easement at $49,502.50. Id.

In a separate decision, the Tax Court held that the Taxpayers' state tax credits were capital assets and that their holding periods were insufficient to qualify for long-term capital gain treatment. Tempel, 136 T.C. at 355. The resulting income was thus properly reported as short-term capital gains.

This appeal followed.

Discussion

We review the Tax Court's determination and application of law de novo. Cox v. Comm'r, 514 F.3d 1119, 1123 (10th Cir. 2008). However, the Supreme Court has counseled that, "[w]hile [the Tax Court's] decisions may not be binding precedents for courts dealing with similar problems, uniform administration would be promoted by conforming to them where possible." Dobson v. Comm'r, 320 U.S. 489, 502 (1943). Rulings by the Tax Court on matters of tax law are

therefore persuasive authority, especially if consistently followed.

On the other hand, we review the Tax Court's findings of fact for clear error. Cox, 514 F.3d at 1123. The Supreme Court has delineated the nature of our review:

> The Tax Court has the primary function of finding facts in tax disputes, weighing the evidence, and choosing from among conflicting factual inferences and conclusions those which it considers most reasonable. The Circuit Courts of Appeals have no power to change or add to those findings of fact or to reweigh the evidence.

Comm'r v. Scottish Am. Inv. Co., 323 U.S. 119, 123-24 (1944). Our review of such matters is limited to asking whether the Tax Court's decision "is supported by substantial evidence and is not clearly erroneous." Home Co. v. Comm'r, 212 F.2d 637, 639 (10th Cir. 1954).

The Taxpayers point to three errors by the Tax Court, each of which they frame as a "misapplication of legal standards and methodologies mandated by the Internal Revenue Code and Treasury Regulations." Aplt. Br. 17. They argue that: (1) the Tax Court erroneously placed on them the burden of proving the before value of their properties; (2) the Tax Court applied incorrect legal standards in valuing their conservation easements; and (3) the Tax Court erred in determining the holding period of their state tax credits. Aplt. Br. 2-3. We consider each in turn.

A.    Burden of Proof Allocation and Factual Inferences

The Taxpayers argue that the Tax Court erred by placing on them the burden of proving the before value of their properties.  They contend that they satisfied I.R.C. § 7491(a)'s requirement of producing credible evidence on that issue, thus shifting the burden to the Commissioner.  Aplt. Br. 20-30.  Because the burden was not properly allocated, they argue, the Commissioner was allowed to prevail without presenting any "objective evidence" that agriculture was the properties' highest and best use.  Id. at 31.  They assert that the Tax Court's decision is devoid of "factual evidence presented by the Commissioner" but is instead supported "through negative presumptions of fact improperly inferred" against them.  Id. at 34.

1.    *Burden of Proof under I.R.C. § 7491*

Generally, deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deduction.  INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84 (1992); Zell v. Comm'r, 763 F.2d 1139, 1141 (10th Cir. 1985).  Moreover, the Commissioner's determination of value is normally presumed correct, and the taxpayer bears the burden of proving that any notice of deficiency is excessive.  Welch v. Helvering, 290 U.S. 111, 115 (1933); United States v. Gosnell, 961 F.2d 1518, 1520 (10th Cir. 1992).  In certain situations, however, the burden of proof may be shifted to the Commissioner.  Section 7491(a) of the I.R.C. shifts the burden of proof to the Commissioner on any

factual issue that the taxpayer supports with credible evidence.  I.R.C. § 7491(a).[5]

The Taxpayers argue that they introduced credible evidence that gravel mining was their properties' highest and best use, thus shifting the burden to the Commissioner to disprove that matter.  Aplt. Br. 20-30.  For the purpose of their appeal we will assume—without deciding—that they were entitled to § 7491's burden shift.  However, like the Tax Court, we conclude that the application of § 7491 is immaterial to the outcome of this case because, on this record, the Tax Court could hold that the preponderance of the evidence favored the Commissioner.

Congress enacted § 7491 to remove a perceived disadvantage experienced by taxpayers who litigate with the IRS.  See S. Rep. No. 105-174, at 44 (1998).  It did so by requiring that if both sides produce evidence and "the court believes that the evidence is equally balanced, [then] the court shall find that the Secretary

---

[5] In addition to introducing "credible evidence" regarding the factual issue, § 7491(a) requires that

> (A) the taxpayer has complied with the requirements under this title to substantiate any item;
>
> (B) the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; and
>
> (C) in the case of a partnership, corporation, or trust, the taxpayer is described in section 7430(c)(4)(A)(ii).

I.R.C. § 7491(a)(2)(A)–(C).

has not sustained his burden of proof." Id. at 46.  In applying § 7491, however,

courts have concluded that if the evidence is not "equally balanced," then there is

no need to rule on whether the burden shifts to the IRS.  Trout Ranch, LLC v.

Comm'r, 493 F. App'x 944, 955 (10th Cir. 2012) (unpublished);[6] Whitehouse

Hotel Ltd. P'ship v. Comm'r, 615 F.3d 321, 332-33 (5th Cir. 2010); Keating v.

Comm'r, 544 F.3d 900, 906 (8th Cir. 2008); Geiger v. Comm'r, 279 F. App'x

834, 835 (11th Cir. 2008) (unpublished); Blodgett v. Comm'r, 394 F.3d 1030,

1039 (8th Cir. 2005); FRCG Inv., LLC v. Comm'r, 89 F. App'x 656, 656 (9th Cir.

2004) (unpublished); Knudsen v. Comm'r, 131 T.C. 185, 189 (T.C. 2008).

Importantly, the Eighth Circuit has held that:

> In a situation in which both parties have satisfied their
> burden of production by offering some evidence, then
> the party supported by the weight of the evidence will
> prevail regardless of which party bore the burden of
> persuasion, proof or preponderance.  Therefore, a shift
> in the burden of preponderance has real significance
> only in the rare event of an evidentiary tie.

Blodgett, 394 F.3d at 1039 (internal citation omitted); see also Keating, 544 F.3d

at 906.  This court has previously utilized this approach, see Trout Ranch, LLC,

493 F. App'x at 955, and we do so again.[7]  Section 7491 does not require an

---

[6] We cite this and other unpublished dispositions for their persuasive value only.  10th Cir. R. 32.1(A).

[7] The Taxpayers' reliance on another Eighth Circuit case, Griffin v. Comm'r, 315 F.3d 1017 (8th Cir. 2003), is unavailing.  First, in a subsequent opinion, the Eighth Circuit expressly abandoned Griffin and adopted the approach set out above.  Blodgett, 394 F.3d at 1039.  And second, the Eighth Circuit's

express burden shift when both parties produce evidence and the preponderance favors one party over the other.

2.      *Preponderance of the Evidence*

The burden issue aside, it is next logical to ask whether a preponderance of the evidence did in fact favor the Commissioner. To determine this anew would require us to reweigh the evidence, something that we are powerless to do. Scottish Am. Inv. Co., 323 U.S. at 124. The Tax Court's finding—that the weight of the evidence favored agriculture as the properties' highest and best use—will therefore stand "if it is supported by substantial evidence and is not clearly erroneous." Home Co., 212 F.2d at 639. The Taxpayers have not expressly requested such review, instead framing the Tax Court's error as a misapplication of law reviewed de novo. See Aplt. Br. 17, 19, 35, 41.

We will, however, briefly address the Taxpayers' contention that the Commissioner produced no "credible," "reliable," or "objective" evidence regarding the highest and best use of the properties. Aplt. Br. 22-24, 31, 34, 35. We start by noting that the Commissioner need not produce any evidence if other evidence in the record satisfies his burden for him: "The case law is clear that the

decision in Griffin was based on the fact that the court, on the record before it, could not determine whether § 7491's burden shift played a role in determining the outcome of that case, i.e., whether the evidence was so evenly balanced that the Commissioner could not be deemed to have met his burden. Griffin, 315 F.3d at 1022. On the record before us, we do not believe that the Tax Court clearly erred by concluding that the preponderance of the evidence favored the Commissioner.

determination whether [the Commissioner's burden of proof] has been satisfied is not limited to [the Commissioner's] affirmative evidence but can be made on the basis of the whole record." Anclote Psychiatric Ctr., Inc. v. Comm'r, 76 T.C.M. (CCH) 175, 1998 WL 421954, at *13 (T.C. 1998), aff'd, 190 F.3d 541 (11th Cir. 1999). See also Silverman v. Comm'r, 538 F.2d 927, 933 (2d Cir. 1976); Clark v. Comm'r, 266 F.2d 698, 717 (9th Cir. 1959); cf. Salehpoor v. Shahinpoor, 358 F.3d 782, 786 (10th Cir. 2004) (court reviews "record as a whole" to determine whether moving party is entitled to judgment as a matter of law). In this case, the Tax Court determined that much of the Taxpayers' own evidence undermined their position that gravel mining was their properties' highest and best use. Esgar Corp., 2012 WL 371809, at *9, *10, *11, *15 n.22, *16-17, *17 n.24, *17-18, *18, *19. The conclusion that this evidence weighed in the Commissioner's favor was not clearly erroneous.

Additionally, the Taxpayers' assertion that the Commissioner's case was devoid of "factual evidence" is incorrect. Aplt. Br. 34. The Commissioner offered the expert testimony of Kevin McCarty, a certified general appraiser who had appraised some 150 conservation easements. Esgar Corp., 2012 WL 371809, at *12-13; Tr. Trans. at 595-706, Esgar Corp., 103 T.C.M (CCH) 1185 (No. 2012-35). Mr. McCarty opined that the properties' highest and best use was agriculture. Esgar Corp., 2012 WL 371809, at *12. Whether to accept Mr. McCarty's expert opinion was for the Tax Court to decide "in the exercise of [its]

- 12 -

sound judgment." Hughes v. Comm'r, 97 T.C.M. (CCH) 1488, 2009 WL 1227938, at *5 (T.C. 2009); see also Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938). Mr. McCarty's opinion was certainly one way of viewing the evidence. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer, 470 U.S. 564, 574 (1985). Moreover, Mr. McCarty's expert opinion constitutes substantial evidence on which the Tax Court could base its conclusion that agriculture was the properties' highest and best use.

3.      *Missing-Evidence Inference*

Finally, the Taxpayers argue that the Tax Court erred by drawing an adverse factual inference against them. Aplt. Br. 31-35. In its analysis, the Tax Court noted Mr. McCarty's estimate that over 39 million tons of aggregate remained to be mined in the four existing Prowers County mines, with nearly 24 million tons remaining in the Midwestern Farms Pit itself. Esgar Corp., 2012 WL 371809, at *17. Looking for competing evidence from the Taxpayers, the Tax Court stated:

> Neither [the Taxpayers] nor their experts provided us with an estimate of remaining aggregate. [The Taxpayers] own the land on which the Midwestern Farms Pit is situated and chose not to provide information on the amount of aggregate remaining. Their failure to introduce evidence "which if true, would be favorable to . . . [them], gives rise to the presumption that if produced it would be unfavorable."

- 13 -

Id. (ellipsis and third alteration in original) (quoting Wichita Terminal Elevator Co. v. Comm'r, 6 T.C. 1158, 1165 (T.C. 1946), aff'd, 162 F.2d 513 (10th Cir. 1947)).  The Taxpayers argue that it was impermissible to use this "missing-evidence" inference against them, given that the burden of proof rested with the Commissioner.

We disagree.  It is the function of the Tax Court to "draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case."  Powers v. Comm'r, 105 T.C.M. (CCH) 1798, 2013 WL 2338502, at *7 (T.C. 2013); see Scottish Am. Inv. Co., 323 U.S. at 124; Nat'l Grocery Co., 304 U.S. at 294; Home Co., 212 F.2d at 639.  The Tax Court may draw these inferences from the whole record, including the Commissioner's evidence on a given fact and the taxpayer's lack thereof.  See Anclote Psychiatric Ctr., Inc., 1998 WL 421954, at *13.

Inference drawing does not constitute a shift in the burden of proof.  The Seventh Circuit rejected such an argument in Steiner v. Comm'r, 350 F.2d 217 (7th Cir. 1965).  In that case—where the Commissioner held the burden of proving the taxpayer's fraud—the court noted that:

> It is contended, by taxpayer, that by drawing adverse inferences from his failure to call certain witnesses, the Tax Court shifted the burden of proof to him.  He testified that he told his wife about the [alleged fraud].  She was not called as a witness by taxpayer and from this failure the Tax Court drew the inference that her testimony would be unfavorable to him.

> While failure of the taxpayer to present evidence would not of itself be sufficient to satisfy the Commissioner's burden of proof as to fraud, where the Commissioner has made out a prima facie case, as we think he did here, adverse inferences may properly be drawn from the taxpayer's failure to call witnesses who would otherwise be expected to be favorable to him.

Steiner, 350 F.2d at 222-23 (internal footnote and citation omitted).

As discussed above, the Tax Court's decision is supported by a record of evidence from both sides. Presented with Mr. McCarty's estimate, the Tax Court did not rely solely on the missing-evidence inference to find that existing supply in Prowers County was sufficient to satisfy future increases in demand. That inference was just one more factor indicating that gravel mining was not the properties' highest and best use.

B.     Conservation Easement Valuation

Next, the Taxpayers argue that the Tax Court applied erroneous legal standards to value their conservation easements. They make two arguments: (1) that the Tax Court erred by adopting the properties' current use as its highest and best use rather than taking a "development-based approach," Aplt. Br. 38; and (2) that the Tax Court erred by citing eminent domain principles in reaching its valuation determination. We address both issues.

1.     *Objective Assessment of the Likelihood of Development*

The Taxpayers argue for a development-based approach to valuation, i.e., that if future development would result in a higher value than current use, the

court must take that into account and hold future development to be the properties' highest and best use. Aplt. Br. 36-38. They apparently argue that because the Tax Court found the properties' current use, agriculture, to be its highest and best use, it necessarily erred in its highest and best use determination. Aplt. Reply Br. 2-3, 4.

Although taxpayers are generally not permitted to deduct contributions of an interest in property less than their entire interest, Congress has permitted such partial interest contributions where the interest donated is a "qualified conservation contribution." I.R.C. § 170(f)(3)(B)(iii). Commonly called "conservation easements," the contribution must meet certain statutory requirements, id. at § 170(h), none of which are at issue here. Often value is the only contested issue concerning the tax treatment of conservation easements.

Valuation can prove difficult because "most open-space easements are granted by deed of gift [so that] there is rarely an established market from which to derive the fair market value." Symington v. Comm'r, 87 T.C. 892, 895 (T.C. 1986). The IRS addressed this problem through regulations. See Treas. Reg. § 1.170A-14 (as amended in 2009). Treasury Regulation § 1.170A-14 provides that the value of a conservation easement is "the fair market value of the perpetual conservation restriction at the time of the contribution." Id. at § 1.170A-14(h)(3)(i). There are two alternative methods of calculating this value: the "comparable sales" method and the "before and after" method. Id.

Under the comparable sales method, the donated easement's fair market value may be extrapolated from sales of other easements, "[i]f there is a substantial record of sales of easements comparable to the donated easement." Id. Because it is often the case that such sales are few and far between, the regulations provide for an alternative measure—the before and after method:

> If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction.

Id. Stated plainly, the before and after method asks "what was the difference, if any, in the value of the property with and without the easement?" Hilborn v. Comm'r, 85 T.C. 677, 688 (T.C. 1985). A decrease in value is often caused by the relinquishment of the property's "highest and best" use:

> If before and after valuation is used, the fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use.

Id. at § 1.170A-14(h)(3)(ii).

The highest and best use inquiry is one of objective probabilities. The

"realistic, objective potential uses for property control" its valuation. <u>Symington</u>, 87 T.C. at 896 (citing <u>Stanley Works & Subsidiaries v. Comm'r</u>, 87 T.C. 389, 400 (T.C. 1986)). Valuation does not depend on "whether the owner actually has put the property to its highest and best use." <u>Id.</u> at 897. Rather, courts must "focus on 'the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'" <u>Id.</u> (quoting <u>Olson v. United States</u>, 292 U.S. 246, 255 (1934));[8] <u>see also</u> <u>Whitehouse Hotel Ltd. P'ship</u>, 615 F.3d at 335. A suggested higher use other than current use "requires both 'closeness in time' and 'reasonable probability.'" <u>Hilborn</u>, 85 T.C. at 689.

The IRS has adopted this objective approach to highest and best use. Treasury Regulation § 1.170A-14 calls for the court to objectively assess "how immediate or remote the likelihood is that the property . . . would in fact be developed." Treas. Reg. § 1.170A-14(h)(3)(ii). This is the same as asking a court to determine the reasonable probability that development is "likely to be needed in the reasonably near future." <u>Symington</u>, 87 T.C. at 897.

We have some difficulty accepting the Taxpayers' position. First, the record belies their contention that the Tax Court "failed to identify" the proper valuation standard. Aplt. Br. 18. The Tax Court stated that the fair market value

---

[8] Elsewhere, the Taxpayers attack reliance on eminent domain cases such as <u>Olson v. United States</u>. But <u>Symington</u>, which the Taxpayers call "a landmark conservation easement case," Aplt. Br. 38, cited <u>Olson</u> for the same reasons that the Taxpayers cite <u>Symington</u>. <u>Symington</u>, 87 T.C. at 896-97.

of property "must be evaluated considering the property's highest and best use." Esgar Corp., 2012 WL 371809, at *7. To that end, it cited § 1.170A-14(h)(3)(ii), Symington, and other highest and best use cases. Id. Its opinion centered on an assessment of gravel mining as the highest and best use of the properties. Id. at *15-19.

The Taxpayers also argue that the Tax Court erred in its application of the highest and best use standard. Aplt. Br. 18, 35-41. They do not argue that the Tax Court erred in its finding that gravel mining was not the properties' most reasonably probable use. That conclusion, of course, would be subject to review for clear error. Cox, 514 F.3d at 1123; Home Co., 212 F.2d at 639. Rather, they ask us to review de novo whether the Tax Court failed to apply the proper highest and best use analysis altogether. Aplt. Br. 39. As mentioned above, it clearly did not.

The Tax Court was not bound to accept gravel mining as the properties' highest and best use if that use was not reasonably probable to manifest in the reasonably near future. See Symington, 87 T.C. at 897. In other words, after taking into account the properties' current use and the fact that the likelihood of development was remote, the Tax Court certainly could find that the properties' current use, agriculture, was its highest and best use. See Treas. Reg. § 1.170A-14(h)(3)(ii). In its objective assessment of the likelihood that the properties would be developed into a gravel mine, the Tax Court found: (1) as of 2004, there

- 19 -

was no unfulfilled demand for gravel in Prowers County, Esgar Corp., 2012 WL 371809, at *16; (2) demand from the Front Range for Prowers County gravel was not poised to increase in the "reasonably foreseeable future," id. at *17; (3) supply produced by the four existing Prowers County gravel pits was sufficient to satisfy any increases in demand, id. at *17-18; and (4) transporting gravel via rail from Prowers County to the Front Range was not a "reasonably foreseeable possibility" in 2004, id. at *18.[9]

The Tax Court applied the correct highest and best use standard, looking for the use that was most reasonably probable in the reasonably near future, and it did not clearly err by concluding that use was agriculture.

2.    *Eminent Domain Principles*

The Taxpayers argue that eminent domain principles—standards used to value property to determine just compensation—are wholly inapplicable when valuing conservation easements. Aplt. Br. 39-41. We have already held that the Tax Court applied the proper valuation methodology, i.e., an objective assessment of the likelihood that the properties would be developed into a gravel mine. We fail to see how eminent domain principles tainted that assessment.

The Taxpayers have not satisfied us that we are comparing apples and oranges when it comes to evaluating highest and best use. Conservation easement

---

[9] The Taxpayers argue that contrary conclusions can be drawn from the record. However, there is ample evidence in the record to support the Tax Court's findings.

valuation requires a finding of "highest and best use." See Treas. Reg. § 1.170A-14(h)(3)(ii). Just compensation valuation requires an identical finding, i.e., the "highest and most profitable use" for which the property was suited before the taking. Olson, 292 U.S. at 255. One of the Taxpayers' experts called Olson v. United States, an eminent domain case, "a kind of landmark for the definition of highest and best use." Tr. Trans. at 513, Esgar Corp., 103 T.C.M (CCH) 1185 (No. 2012-35). The Taxpayers refer to a four-factor highest and best use test that finds significant use in eminent domain cases.[10] Aplt. Br. 8.

The objective assessment that Treas. Reg. § 1.170A-14(h)(3)(ii) requires does not materially differ from that used to determine the highest and best use of property for just compensation valuation. Cases valuing conservation easements cite eminent domain cases without noting any difference between the two concepts. See, e.g., Whitehouse Hotel Ltd. P'ship, 615 F.3d at 335 (citing both Olson and § 1.170A-14(h)(3)(ii) in its discussion of highest and best use); Hughes, 2009 WL 1227938, at *3 (same). In fact, the Tax Court has gone so far as to state, "The principles and legal precedents governing the determination of

---

[10] See, e.g., United States v. 1.604 Acres of Land, 844 F. Supp. 2d 668, 679 (E.D. Va. 2011) (analyzing highest and best use for "whether the use is (1) physically possible; (2) legally permissible; (3) financially feasible; and (4) maximally productive") (citing The Appraisal of Real Estate 278-79 (13th ed. 2008)); see also Brace v. United States, 72 Fed. Cl. 337, 350 (Fed. Cl. 2006); Bassett, N.M. LLC v. United States, 55 Fed. Cl. 63, 69 (Fed. Cl. 2002). The Tax Court has considered these factors when determining the highest and best use of eased property. See, e.g., Hughes, 2009 WL 1227938, at *8 (T.C. 2009).

fair market value of property in tax cases are the same as those that control the

valuation of property in condemnation cases." Stanley Works & Subsidiaries, 87

T.C. at 401 n.8.[11]

We find no material difference between conservation easement valuation

and just compensation valuation in the context of determining a property's highest

and best use.  Section 1.170A-14(h)(3)(ii) does not preclude reference to eminent

domain cases where they inform an objective assessment of the likelihood of

future development.

C.     Holding Period of State Tax Credits

Finally, the Taxpayers argue that their state tax credits, which they held for

about two weeks, were long-term capital assets.  Aplt. Br. 41-43.  They argue that

long-term treatment is appropriate because they held the underlying real

properties for longer than one year, they relinquished development rights in those

properties through the donation of conservation easements, and they received

these tax credits because of those donations.  Aplt. Br. 43.  They cite no authority

---

[11]  The Taxpayers attempt to discredit Stanley Works by pointing out that it was decided under prior tax law, i.e., prior to the enactment of I.R.C. § 170(h) and Treas. Reg. § 1.170A-14(h)(3)(ii).  At oral argument, the Taxpayers attacked Symington for the same reason, after praising it as a "landmark conservation easement case" in their opening brief.  Aplt. Br. 38.  Both Stanley Works and Symington remain persuasive authority because they decided highest and best use based on an objective assessment of reasonably probable uses, something that § 1.170A-14(h)(3)(ii) does also.

clearly supporting this proposition.[12]

The Tax Court correctly concluded that:

> [The Taxpayers] had no property rights in a conservation easement contribution State tax credit until the donation was complete and the credits were granted. The credits never were, nor did they become, part of the [Taxpayers'] real property rights.
>
> Instead, [the Taxpayers'] holding period in their credits began at the time the credits were granted and ended when petitioners sold them. Since petitioners sold their State tax credits in the same month in which they received them, the capital gains from the sale of the credits are short term.

Tempel, 136 T.C. at 355. Moreover, the tax credits did not replace the value of the donated easements through any type of like-kind exchange, thus no "tacking" of holding periods is permitted.[13] See I.R.C. § 1223.

AFFIRMED.

---

[12] Neither did the Taxpayers address the Commissioner's response to this issue in their reply brief, nor did they address this issue at oral argument.

[13] If this were a like-kind exchange (conservation easements in exchange for tax credits), then this would negate the charitable nature of the Taxpayers' contribution. See United States v. Am. Bar Endowment, 477 U.S. 105, 116 (1986) (A donation "generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return.").